UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
EVANSVILLE DIVISION

SCOTT ADAMS,                          )
(Social Security No. XXX-XX-2012),    )
                                      )
              Plaintiff,              )
                                      )
        v.                            )        3:08-cv-64-WGH-DFH
                                      )
MICHAEL J. ASTRUE, COMMISSIONER       )
OF SOCIAL SECURITY,                   )
                                      )
              Defendant.              )


**MEMORANDUM DECISION AND ORDER**


**I.  Statement of the Case**

        Plaintiff, Scott Adams, seeks judicial review of the final decision of the

agency, which found him not disabled and, therefore, not entitled to Disability

Insurance Benefits ("DIB") under the Social Security Act ("the Act").  42 U.S.C. §§

416(i), 423(d); 20 C.F.R. § 404.1520(f).  This court has jurisdiction over this

action pursuant to 42 U.S.C. § 405(g).[1]

        Plaintiff applied for DIB on August 24, 2005, alleging disability since

March 28, 2005.  (R. 50-52).  The agency denied Plaintiff's application both

initially and on reconsideration.  (R. 33-37).  Plaintiff appeared and testified at a

hearing before Administrative Law Judge George A. Jacobs ("ALJ") on September

---

        [1]The parties filed Consents to Magistrate Judge jurisdiction (Docket Nos. 11, 27)
and an Order of Reference was entered by District Judge Richard L. Young on March
4, 2009 (Docket No. 28).

19, 2007. (R. 508-36). Plaintiff was represented by an attorney; also testifying was a vocational expert ("VE"). (R. 508). On February 24, 2008, the ALJ issued his opinion finding that Plaintiff was not disabled because he retained the residual functional capacity ("RFC") to perform a significant number of jobs in the regional economy. (R. 13-21). The Appeals Council then denied Plaintiff's request for review, leaving the ALJ's decision as the final decision of the Commissioner. (R. 2-4). 20 C.F.R. §§ 404.955(a), 404.981. Plaintiff then filed a Complaint on May 19, 2008, seeking judicial review of the ALJ's decision.

## II. Statement of the Facts

### A. Vocational Profile

Plaintiff was 45 years old at the time of the ALJ's decision and had a high school education. (R. 20). His past relevant work experience included work as an engineering technician/laboratory assistant which was classified as light, skilled work. (R. 20).

### B. Medical Evidence

#### 1. Plaintiff's Physical Impairments

On November 4, 2002, Plaintiff underwent an MRI of the cervical spine which revealed mild central osteophyte and disk protrusion of broad based nature, but otherwise normal results. (R. 172).

On August 3, 2004, Plaintiff was seen at Tri-State Neurosurgical by Christopher L. Sneed, M.D., for a consultation for neck and back pain. (R. 232-34). Plaintiff recounted chronic problems with neck pain as well as headaches

and pain that radiated into his extremities. (R. 232). Plaintiff's examination revealed good range of motion in his neck, only 45 degrees of forward bending at the waist due to pain, good motor strength, and a gait within normal limits. (R. 233-34). Dr. Sneed recommended a thoracic MRI. (R. 234).

On August 17, 2004, Plaintiff's x-rays of the cervical spine revealed mild degenerative disk changes at C5-6 and C6-7. Plaintiff also had mild disk space narrowing at C6-7. Additionally, there was minimal physiological subluxation at C3-4 and C4-5. (R. 151).

On January 7 and 21, 2005, Plaintiff underwent cervical epidural steroid injections and bilateral greater occipital nerve blocks. (R. 393-95).

Plaintiff saw his primary physician, Vernon Vix, M.D., on February 23, 2005, and Dr. Vix noted that his neck range of motion was only about 20-30 percent of normal. (R. 436). Dr. Vix again examined Plaintiff on March 9, 2005, for neck pain with cervical radiculopathy. (R. 300). Plaintiff reported no benefit from physical therapy or injections. Dr. Vix recommended a referral to a neurologist. (R. 300).

Plaintiff visited the emergency room three times with headaches and neck pain on March 25, 2005. (R. 291-97).

On March 28, 2005, Plaintiff visited Dr. Vix with neck pain and was referred to Dr. Sneed. (R. 285). On April 22, 2005, Plaintiff was seen again by Dr. Sneed. (R. 235-37). Plaintiff's cervical pain had been manageable from August 2004 to March 2005, but the pain "worked up to crescendo" and on

March 25, 2005, Plaintiff was in the emergency room three times. (R. 235). Plaintiff's exam revealed mild decrease in range of motion in all directions, limitation of forward bending to 20 degrees at the waist because of pain, full motor strength, and normal gait. (R. 236-37). Dr. Sneed opined that the degenerative changes in Plaintiff's neck could cause neck pain and trigger headaches. (R. 237). A referral to the Indiana University Medical Center was recommended. (R. 237).

On April 21, 2005, Dr. Vix observed that Plaintiff remained off work because of neck pain and grogginess caused by Dilaudid. (R. 445). Again, Plaintiff was seen on May 17, 2005, by Dr. Vix for neck pain with radicular symptoms. (R. 277). Plaintiff had a good range of motion in his neck with pain at the extremes and normal reflexes; Dr. Vix diagnosed cervical radiculopathy. (R. 277).

Plaintiff visited Clarian Health for a consultation on May 31, 2005. (385-87). Cynthia Hingtgen, M.D., examined Plaintiff and found normal muscle bulk and strength, normal sensation, and a slightly unsteady gait. (R. 386). Plaintiff complained of pain upon palpation of areas of his cervical spine. (R. 386). Dr. Hingtgen concluded that Plaintiff was not a surgical candidate because testing did not show any nerve impingement. However, an EMG of Plaintiff's left upper extremity and neck were ordered, and Dr. Hingtgen referred Plaintiff to the Indiana University Pain Management Clinic. (R. 386).

A nerve conduction study performed in June 2005 yielded normal results. (R. 504-05).

On June 28, 2005, Plaintiff again visited Dr. Vix and was in obvious distress in his neck. (R. 274). Dr. Vix also made note that Plaintiff was slightly depressed but indicated that Plaintiff was not ready to deal with his depression. Dr. Vix noted that Plaintiff's visits with a neurologist did not lead to a resolution and, after a thorough review of Plaintiff's symptoms, Dr. Vix indicated that he did not have much else to add. (R. 274).

Plaintiff was examined on July 8, 2005, at the Indiana University Pain Management Clinic. (R. 255-58). Joshua Wellington, M.D., noted that Plaintiff had been treated in May 2004 and March 2005 with steroid injections and greater occipital nerve blocks. (R. 255). Dr. Wellington's exam of Plaintiff found severely limited range of motion in Plaintiff's neck, a normal gait, full strength in upper and lower extremities, and a positive straight leg raise and positive Patrick's sign on the left. (R. 257). Dr. Wellington's impression was cervical facet arthropathy and cervical spondylosis at C4-7 as well as occipital nerve pain. (R. 257). Dr. Wellington performed bilateral occipital nerve blocks and recommended that if those did not work, Plaintiff should try radiofrequency modulation of the occipital nerves. (R. 258).

On July 21, 2005, Plaintiff returned to the Indiana University Pain Management Clinic for pulsed radiofrequency modulation and nerve block of his

greater occipital nerves.  (R. 259-60).  On August 22, 2005, Plaintiff returned

and underwent medial branch nerve blocks at C4, C5, and C6.  (R. 316-17).

David Bose, M.D., examined Plaintiff on October 8, 2005.  (R. 342-43).

Plaintiff demonstrated good grip strength in both hands, but some decreased fine

finger manipulation ability with his left hand.  Plaintiff also dragged his left leg

while walking, had a slow, unstable gait, was unable to hop or squat, and could

only walk on heels and toes with great difficulty.  (R. 343).  Dr. Bose diagnosed

degenerative disk disease of the cervical spine with nerve impingement.  (R. 343).

He concluded that Plaintiff could sit and walk for only two hours throughout an

eight hour workday intermittently, and could only lift five to ten pounds.  (R.

343).

On October 25, 2005, Plaintiff saw Dr. Vix for follow-up of neck pain and

depression.  (R. 310).  It was noted that Plaintiff's radiofrequency ablation

treatment only resulted in the pain being reduced by fifty percent and that

Plaintiff still had to take eight to nine Dilaudid pills at times for the pain.  (R.

310).  On October 27, 2005, Plaintiff returned to Dr. Vix reporting that the use of

MS Contin had improved Plaintiff's neck pain significantly.  (R. 311).  Plaintiff

was, however, still having a few exacerbations of the neck pain.

On November 4, 2005, Plaintiff was seen at the Indiana University Pain

Management Clinic for a follow-up.  (R. 217).  Dr. Wellington noted that

Plaintiff's neck pain had been treated in June, August, and October 2005 with

medial branch nerve blocks.  (R. 217).  These only provided relief for a short

duration.  Dr. Wellington opined that Plaintiff's cervical facet joints were pain generators.  (R. 217).  Dr. Wellington recommended radiofrequency ablation of the cervical medial branches.  (R. 217).

In a letter dated March 5, 2006, Dr. Vix noted that an MRI of Plaintiff's neck revealed that nerves affecting his left arm had been pinched.  (R. 178).

On February 22, 2006, Plaintiff visited Dr. Vix for neck pain and hyperlipidemia.  (R. 169).  Plaintiff noted that his neck pain was controlled most of the time, but that at times he has to take Dilaudid four times a day.  (R. 169).  He takes MS Contin the rest of the time to ease the neck pain; nerve blocks and radiofrequency ablation have also been tried with modest success.  (R. 169).  Plaintiff was also treated on January 17, 2006, for chronic neck pain by Dr. Vix; it was noted that Plaintiff's neck moved quite stiffly.  (R. 170).

Plaintiff was seen by Dr. Vix on April 5, 2006, for nondescript chest pain.  (R. 166).  Dr Vix noted that Plaintiff is "still bothered by his neck pain and this is really coloring everything."  (R. 166).  Dr. Vix ordered a CT scan to look for a pulmonary embolus and also a cardiac stress test.  (R. 166).

On July 11, 2006, Dr. Vix noted that he was attempting to get Plaintiff seen by the Mayo Clinic for neck pain.  (R. 156).  Plaintiff had used 90 Dilaudid pills in a 21-day period.  (R. 156).  Plaintiff was also noted to be "mildly depressed."

From July 19-25, 2006, Plaintiff underwent an extensive work-up at the Mayo Clinic for his complaints of head, back, and neck pain; Plaintiff was

evaluated by Toni J. Hanson, M.D., at Mayo's Department of Spine Center. (R. 181-97). Plaintiff's neck displayed decreased range of motion to cervical extension and flexion as well as lateral rotation. Also, Spurling's maneuver revealed pain at the base of the neck. (R. 186). Plaintiff also demonstrated pain behavior on heel and toe walking and tandem gait. (R. 186). Review of MRI results revealed that Plaintiff had a small disk bulge at C5-6 and C6-7 and at L4-5. (R. 186-87). However, there was no nerve root compression, and EMG testing yielded normal results. (R. 194-96). Neurological examination of his arms and legs yielded normal results. (R. 186). Evaluators at Mayo reported their impression as follows: (1) chronic pain syndrome; (2) cervical spondylosis with chronic neck pain; (3) headaches with a component of migraine headaches; (4) myofascial upper back syndrome; (5) low back pain with disk disorder; (6) left arm and leg pain; (7) narcotic use for pain control; (8) chronic nicotine use; and (9) off of work. (R. 192-93).

Dr. Vix examined Plaintiff on August 14, 2006, and noted that he was using OxyContin and Dilaudid for chronic neck pain but stated, "I really do not have a lot more to offer him, and neither does anybody else that we have referred [him] to." (R. 152).

On February 12, 2007, Plaintiff was seen by Dr. Vix for his recurring problems including neck pain and depression. (R. 94). Plaintiff used Dilaudid intermittently for the neck pain. (R. 94). His migraine headaches were under good control. (R. 94). His neck pain was referred to as "chronic and pretty

hopeless." (R. 94). Earlier in February Dr. Vix had examined Plaintiff for right shoulder pain and found a reduced range of motion and a positive impingement sign. (R. 95).

On August 13, 2007, Plaintiff visited Dr. Vix for an annual examination. (R. 81-82). Plaintiff had been followed for migraine headaches, hyperlipidemia, chronic pain syndrome of the neck, upper and lower back, and infectious asthma. (R. 81). Plaintiff reported needing to use Maxalt once a month for his migraines; he used to need to go to the emergency room once a month for migraines but now only needs to go once a year. (R. 81). Plaintiff also complained of hand and foot pain and swelling. (R. 81).

On August 17, 2007, Plaintiff was seen by Kamal L. Ramahi, M.D., for complaints of hand pain as well as stiffness and swelling in the joints of his hands. (R. 79-80). Dr. Ramahi found a normal neurological exam including muscle strength. (R. 80). He found features suggestive of fibromyalgia. (R. 80). Plaintiff also had markedly limited range of motion of internal rotation of the right shoulder; Dr. Ramahi noted shoulder tendonitis/bursitis. (R. 80).

On August 19, 2007, Dr. Vix completed a form in which he opined that Plaintiff could stand for five hours and sit for eight hours in a workday. (R. 100). Plaintiff could stand for two hours at a time. Dr. Vix believed Plaintiff would require one or more extra breaks throughout the day about half of the time. Dr. Vix opined that Plaintiff could lift and carry less than ten pounds, and he believed he would be unable to maintain a full-time work schedule without

excessive absences and periods during which he could not maintain focus throughout an entire workday.  (R. 100).

## 2.  State Agency Review

State agency physicians reviewed the evidence in November 2005 and February 2006 and concluded that Plaintiff could perform limited ranges of light level work.  (R. 334-41).  In October 2005, State agency psychologist B.R. Horton, Psy.D., concluded that the evidence did not document the existence of a severe mental impairment; this was confirmed in February 2006 by psychologist J. Larsen, Ph.D.  (R. 200, 367).

## III.  Standard of Review

An ALJ's findings are conclusive if they are supported by substantial evidence.  42 U.S.C. § 405(g).  Substantial evidence is defined as "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Richardson v. Perales,* 402 U.S. 389, 401 (1971); see also *Perkins v. Chater,* 107 F.3d 1290, 1296 (7th Cir. 1997).  This standard of review recognizes that it is the Commissioner's duty to weigh the evidence, resolve material conflicts, make independent findings of fact, and decide questions of credibility. *Richardson,* 402 U.S. at 399-400.  Accordingly, this court may not re-evaluate the facts, weigh the evidence anew, or substitute its judgment for that of the Commissioner.  *See Butera v. Apfel,* 173 F.3d 1049, 1055 (7th Cir. 1999).  Thus, even if reasonable minds could disagree about whether or not an individual was

"disabled," the court must still affirm the ALJ's decision denying benefits. *Schmidt v. Apfel,* 201 F.3d 970, 972 (7th Cir. 2000).

## IV.  Standard for Disability

In order to qualify for disability benefits under the Act, Plaintiff must establish that he suffers from a "disability" as defined by the Act.  "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of a medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months."  42 U.S.C. § 423(d)(1)(A).  The Social Security regulations set out a sequential five-step test the ALJ is to perform in order to determine whether a claimant is disabled.  *See* 20 C.F.R. § 404.1520. The ALJ must consider whether the claimant:  (1) is presently employed; (2) has a severe impairment or combination of impairments; (3) has an impairment that meets or equals an impairment listed in the regulations as being so severe as to preclude substantial gainful activity; (4) is unable to perform his past relevant work; and (5) is unable to perform any other work existing in significant numbers in the national economy.  *Id.*  The burden of proof is on Plaintiff during steps one through four, and only after Plaintiff has reached step five does the burden shift to the Commissioner.  *Clifford v. Apfel,* 227 F.3d 863, 868 (7th Cir. 2000).

## V.  The ALJ's Decision

The ALJ concluded that Plaintiff was insured for DIB through the date of the ALJ's decision; Plaintiff also had not engaged in substantial gainful activity since the alleged onset date.  (R. 15).  The ALJ found that, in accordance with 20 C.F.R. § 404.1520, Plaintiff had two impairments that are classified as severe: degenerative disk disease of the cervical spine with radiculopathy to the arms and depression.  (R. 15).  The ALJ concluded that these impairments did not meet or substantially equal any of the impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1.  (R. 15).  Additionally, the ALJ opined that Plaintiff's allegations regarding the extent of his limitations were not fully credible.  (R. 18). Consequently, the ALJ concluded that Plaintiff retained the RFC for sedentary work except that he can only occasionally perform postural activities; he can never climb ladders, ropes, or scaffolds; he can frequently reach with both upper extremities; and he is limited to simple repetitive tasks that involve no more than occasional contact with the public, co-workers, or supervisors.  (R. 17).  The ALJ opined that Plaintiff could not perform his past work.  (R. 20).  However, the ALJ opined that Plaintiff retained the RFC for a significant number of jobs in the regional economy, including 1,200 inspector jobs, 1,400 assembler jobs, and 800 packer jobs.  (R. 21).  The ALJ concluded by finding that Plaintiff was not under a disability.  (R. 21).

## VI.  Issues

Plaintiff has raised two issue. The issues are as follows:

1. Whether the ALJ should have given controlling weight to Dr. Vix.

2. Whether the ALJ failed to follow SSR 96-7p regarding Plaintiff's credibility.

**Issue 1:  Whether the ALJ should have given controlling weight to Dr. Vix.**

Plaintiff argues that the ALJ should have given controlling weight to the opinions of Dr. Vix.  Opinions of a treating physician are generally entitled to controlling weight.  *Clifford v. Apfel,* 227 F.3d 863, 870 (7th Cir. 2000).  However, an ALJ may reject the opinion of a treating physician if it is based on a claimant's exaggerated subjective allegations, is internally inconsistent, or is inconsistent with other medical evidence in the record.  *Dixon v. Massanari,* 270 F.3d 1171, 1177-78 (7th Cir. 2001).  Additionally, 20 C.F.R. § 404.1527 provides guidance for how the opinions of treating and nontreating sources are to be evaluated and explains as follows:

> (d)  *How we weigh medical opinions.*  Regardless of its source, we will evaluate every medical opinion we receive.  Unless we give a treating source's opinion controlling weight under paragraph (d)(2) of this section, we consider all of the following factors in deciding the weight we give to any medical opinion.
>
> (1)  *Examining relationship.*  Generally, we give more weight to the opinion of a source who has examined you than to the opinion of a source who has not examined you.
>
> (2)  *Treatment relationship.*  Generally, we give more weight to opinions from your treating sources, since these sources are likely to be the medical professionals most able to provide a detailed, longitudinal picture of your medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone or from reports of individual examinations, such as consultative examinations or brief

hospitalizations.  If we find that a treating source's opinion on the issue(s) of the nature and severity of your impairment(s) is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in your case record, we will give it controlling weight. When we do not give the treating source's opinion controlling weight, we apply the factors listed in paragraphs (d)(2)(i) and (d)(2)(ii) of this section, as well as the factors in paragraphs (d)(3) through (d)(6) of this section in determining the weight to give the opinion.  We will always give good reasons in our notice of determination or decision for the weight we give your treating source's opinion.

(i) *Length of the treatment relationship and the frequency of examination.*  Generally, the longer a treating source has treated you and the more times you have been seen by a treating source, the more weight we will give to the source's medical opinion.  When the treating source has seen you a number of times and long enough to have obtained a longitudinal picture of your impairment, we will give the source's opinion more weight than we would give it if it were from a nontreating source.

(ii) *Nature and extent of the treatment relationship.*  Generally, the more knowledge a treating source has about your impairment(s) the more weight we will give to the source's medical opinion.  We will look at the treatment the source has provided and at the kinds and extent of examinations and testing the source has performed or ordered from specialists and independent laboratories.  For example, if your ophthalmologist notices that you have complained of neck pain during your eye examinations, we will consider his or her opinion with respect to your neck pain, but we will give it less weight than that of another physician who has treated you for the neck pain.  When the treating source has reasonable knowledge of your impairment(s), we will give the source's opinion more weight than we would give it if it were from a nontreating source.

(3) *Supportability.*  The more a medical source presents relevant evidence to support an opinion, particularly medical signs and laboratory findings, the more weight we will give that opinion. The better an explanation a source provides for an opinion, the more weight we will give that opinion.  Furthermore, because nonexamining sources have no examining or treating relationship with you, the weight we will give their opinions will depend on the degree to which they provide supporting explanations for their

opinions.  We will evaluate the degree to which these opinions consider all of the pertinent evidence in your claim, including opinions of treating and other examining sources.

(4) *Consistency.*  Generally, the more consistent an opinion is with the record as a whole, the more weight we will give to that opinion.

(5) *Specialization.*  We generally give more weight to the opinion of a specialist about medical issues related to his or her area of specialty than to the opinion of a source who is not a specialist.

(6) *Other factors.*  When we consider how much weight to give to a medical opinion, we will also consider any factors you or others bring to our attention, or of which we are aware, which tend to support or contradict the opinion.  For example, the amount of understanding of our disability programs and their evidentiary requirements that an acceptable medical source has, regardless of the source of that understanding, and the extent to which an acceptable medical source is familiar with the other information in your case record are relevant factors that we will consider in deciding the weight to give to a medical opinion.

*****

(f) *Opinions of nonexamining sources.*  We consider all evidence from nonexamining sources to be opinion evidence.  When we consider the opinions of nonexamining sources, we apply the rules in paragraphs (a) through (e) of this section.  In addition, the following rules apply to State agency medical and psychological consultants, other program physicians and psychologists, and medical experts we consult in connection with administrative law judge hearings and Appeals Council review:

(1)  In claims adjudicated by the State agency, a State agency medical or psychological consultant (or a medical or psychological expert (as defined in § 405.5 of this chapter) in claims adjudicated under the procedures in part 405 of this chapter) will consider the evidence in your case record and make findings of fact about the medical issues, including, but not limited to, the existence and severity of your impairment(s), the existence and severity of your symptoms, whether your impairment(s) meets or equals the requirements for any impairment listed in appendix 1 to this

subpart, and your residual functional capacity. These
administrative findings of fact are based on the evidence in your
case record but are not themselves evidence at these steps.

20 C.F.R. § 404.1527.

The ALJ in this case decided that the opinions of Dr Vix regarding

Plaintiff's need for excessive absences was not entitled to controlling weight.

Specifically, the ALJ gave "limited weight to Dr. Vix's opinion as there are few

objective signs and findings to support excessive absences from a sedentary job."

(R. 19). It is true that Dr. Vix is Plaintiff's treating physician with a long-

standing treatment relationship. However, a review of the medical evidence

indicates that Dr. Vix's opinion regarding absences appears only in a form (R.

100) and there does not appear to be solid objective support for the need for

excessive absences.

The ALJ specifically referenced the opinions of Dr. Cynthia Hingtgen, who

noted that Plaintiff was not a surgical candidate because radiographic studies

did not show nerve impingement, and who found normal muscle bulk and

strength, normal sensory examination, and normal gait. (R. 18). The ALJ also

referenced an "extensive work up" at the Mayo Clinic where MRI studies were

negative for nerve root compression, where no functional limitation of the neck

was found, and where upper and lower neurological examinations were

completely normal. (R. 19). Finally, Plaintiff's migraine headaches, which could

have required the need to be absent from work on occasion, have resolved

significantly to the point where Plaintiff does not need to make frequent trips to

the emergency room.  (R. 81-82, 94).  The ALJ limited Plaintiff to sedentary work with additional limitations including only occasional postural activities, accepting in some part Dr. Vix's restrictions.  Given that Dr. Vix's opinions concerning the amount of time Plaintiff would miss from work was not supported by objective medical evidence and that opinion was inconsistent with the more objectively based findings of Dr. Hingtgen and the Mayo Clinic, it was not error for the ALJ to reject some portions of Dr. Vix's opinion.

**Issue 2:**     **Whether the ALJ failed to follow SSR 96-7p regarding Plaintiff's credibility.**

Plaintiff also claims that the ALJ conducted a flawed credibility determination.  An ALJ's credibility determination will not be overturned unless it is "patently wrong."  *Powers v. Apfel,* 207 F.3d 431, 435 (7th Cir. 2000).  However, here the ALJ's "credibility" decision is not only an analysis of Plaintiff's credibility, but also an evaluation of Plaintiff's complaints of pain.  Therefore, the ALJ must consider SSR 96-7p, the regulation promulgated by the Commissioner, to assess and report credibility issues, as well as 20 C.F.R. § 404.1529(c)(3).

SSR 96-7p states that there is a two-step process that the ALJ engages in when determining an individual's credibility:

> First, the adjudicator must consider whether there is an underlying medically determinable physical or mental impairment(s)--i.e., an impairment(s) that can be shown by medically acceptable clinical and laboratory diagnostic techniques--that could reasonably be expected to produce the individual's pain or other symptoms.  The finding that an individual's impairment(s) could reasonably be expected to produce the individual's pain or other symptoms does not involve a determination as to the intensity, persistence, or functionally limiting effects of the individual's symptoms.  If there is

no medically determinable physical or mental impairment(s), or if there is a medically determinable physical or mental impairment(s) but the impairment(s) could not reasonably be expected to produce the individual's pain or other symptoms, the symptoms cannot be found to affect the individual's ability to do basic work activities.

Second, once an underlying physical or mental impairment(s) that could reasonably be expected to produce the individual's pain or other symptoms has been shown, the adjudicator must evaluate the intensity, persistence, and limiting effects of the individual's symptoms to determine the extent to which the symptoms limit the individual's ability to do basic work activities. For this purpose, whenever the individual's statements about the intensity, persistence, or functionally limiting effects of pain or other symptoms are not substantiated by objective medical evidence, *the adjudicator must make a finding on the credibility of the individual's statements based on a consideration of the entire case record. This includes the medical signs and laboratory findings, the individual's own statements about the symptoms, any statements and other information provided by treating or examining physicians or psychologists and other persons about the symptoms and how they affect the individual, and any other relevant evidence in the case record.* This requirement for a finding on the credibility of the individual's statements about symptoms and their effects is reflected in 20 CFR 404.1529(c)(4) and 416.929(c)(4). These provisions of the regulations provide that an individual's symptoms, including pain, will be determined to diminish the individual's capacity for basic work activities to the extent that the individual's alleged functional limitations and restrictions due to symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence in the case record.

SSR 96-7p (emphasis added). SSR 96-7p further provides that the ALJ's decision regarding the claimant's credibility "must contain specific reasons for the finding on credibility, supported by the evidence in the case record, and must be sufficiently specific to make clear to the individual and to any subsequent reviewers the weight the adjudicator gave to the individual's statements and the reasons for that weight." *Id.*

Moreover, 20 C.F.R. § 404.1529(c)(3) states that when a claimant's subjective individual symptoms, such as pain, are considered, several factors are relevant including: (1) the individual's daily activities; (2) the location, duration, frequency, and intensity of the individual's pain or other symptoms; (3) factors that precipitate and aggravate the symptoms; (4) the type, dosage, effectiveness, and side effects of any medication the individual takes or has taken to alleviate pain or other symptoms; (5) treatment, other than medication, the individual receives or has received for relief of pain or other symptoms; (6) any measures other than treatment the individual uses or has used to relieve pain or other symptoms; and (7) any other factors concerning the individual's functional limitations and restrictions due to pain or other symptoms. 20 C.F.R. § 404.1529(c)(3)(I)-(vii).

In this case, the ALJ did explicitly mention SSR 96-7p and also listed the factors described in § 405.1529. (R. 17-18). The ALJ went on to detail Plaintiff's complaints and his credibility determination as follows:

> The claimant testified that he has severe pain in the left side of his head, his arms, and his shoulders to the elbow of his right arm and into the fingers of his left hand. The pain is relieved somewhat with medication and rest, but it is exacerbated with use, such as lifting or pouring. He also has neck pain that reaches a level 7 on an ascending 1-10 scale (with level 10 being the worst pain imaginable) that is exacerbated with movement. The claimant's treating physician limited him to desk duty, but he was hospitalized in March of 2005 and restricted from all lifting and desk work. His medications make him sleepy and cause constipation. His condition has been stable for the last six months, but he spends most of his time in a recliner. He also has depression as a result of being unable to work, although he didn't think his depression prevented

him from working. He has trouble being around large groups of people. He takes medication for fibromyalgia. On a typical day, he rises at 7 or 8 am and sits in his recliner, trying to keep his head motionless. He prepares microwave meals and he retires at 7:30 to 8:30 pm, but he wakes up 4 or 5 times due to pain. Sometimes, his wife helps him dress, but he can bathe himself most of the time, and he does a few chores around the house. He can walk/stand for one hour in an eight-hour day, and he could lift up to 10 pounds occasionally, but he has problems holding things with his left hand.

After considering the evidence of record, the undersigned finds that the claimant's medically determinable impairments could reasonably be expected to produce the alleged symptoms, but that the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely credible.

(R. 18). This one paragraph – taken in isolation – does appear to be a rather conclusory analysis of Plaintiff's credibility. The ALJ does not explicitly address each of the elements of § 405.1529. For example, the ALJ fails to address why Plaintiff's heavy use of the narcotic pain medication Dilaudid and his extensive treatment history (including numerous nerve blocks, steroid injections, and radiofrequency modulation) do not support his claims of debilitating pain.

However, in reading the paragraphs which follow the initial paragraph in the ALJ's decision addressing credibility, the Magistrate Judge can trace the path of the ALJ's reasoning and believes the ALJ considered other medical evidence as it relates to complaints of pain. The ALJ specifically lists reports from the following sources:

(a)     Dr. Vix, who noted problems with pain between February 2005 and May 2005, but also noted in May that Plaintiff "had good range of motion without exquisitely tender spots noted and his reflexes were 2+ and symmetric in the upper extremities." (R. 18).

(b) Dr. Hingtgen, who notes Plaintiff's radiographic studies did not show nerve impingement; that Plaintiff had normal muscle bulk and strength, normal sensory exam, and a normal casual walk; and a normal nerve conduction study of the left upper extremity. (R. 18).

(c) The "extensive work up" at the Mayo Clinic in June 2006, where MRI studies showed the cervical and lumbar spine were negative for nerve root compression; decreased range of motion of the neck existed, but no apparent functional limitation; and upper and lower neurological examinations were completely normal. (R. 19).

From these recitations, it is apparent that the ALJ did describe how the objective medical evidence which did exist contradicted Plaintiff's complaints of pain to some degree. This analysis by the ALJ is not "patently wrong" and is, therefore, not subject to reversal by this court.

## VII. Conclusion

For the reasons discussed above, the ALJ was not obligated to grant controlling weight to all of the opinions of Dr. Vix. While the ALJ did describe in a less than thorough manner his credibility determination, this court is able to trace the path of his analysis. Though this court might not fully agree with it, that analysis is not "patently wrong." Consequently, there are no errors warranting reversal or remand. The decision of the Commissioner is, therefore, **AFFIRMED**, and the case is **DISMISSED** with each party to bear its own costs.

**SO ORDERED.**

**Dated:** August 3, 2009

William G. Hussmann, Jr.
United States Magistrate Judge
Southern District of Indiana

**<u>Electronic copies to</u>:**

J. Michael Woods
WOODS & WOODS
mwoods@woodslawyers.com

Thomas E. Kieper
UNITED STATES ATTORNEY'S OFFICE
tom.kieper@usdoj.gov